IN UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA



Civil Action No. 4:04-CV-168-H(2)

ADAM L. PERKINS,                    )
                                    )
                    Plaintiff,      )
                                    )
        v.                          )        **MEMORANDUM OF LAW IN**
                                    )        **SUPPORT OF DEFENDANTS'**
TOWN OF PRINCEVILLE and the         )        **MOTION FOR SUMMARY**
PRINCEVILLE POLICE                  )        **JUDGMENT**
DEPARTMENT,                         )
                                    )
                    Defendants.     )
                                    )

Defendants, Town of Princeville and Princeville Police Department

("Defendants"), by and through undersigned counsel, submit the following Memorandum

of Law in support of their Motion for Summary Judgment

## INTRODUCTION

Plaintiff filed this action alleging violations of Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. §2000e et seq. ("Title VII"). Specifically, Plaintiff claims

that Defendants failed to hire Plaintiff because he was unable to work on the Sabbath due

to his religious beliefs. Plaintiff further alleges that Defendants failed to accommodate

his objection to working on the Sabbath.

Defendants' Motion should be granted for the following reasons:

- Plaintiff cannot make out a *prima facie* case of religious discrimination

    because he has failed to provide evidence: (1) of a sincerely-held religious

    belief that conflicted with his employment; (2) that he informed the

    decision maker of a sincerely-held religious belief prior to the decision not

to hire Plaintiff; and (3) that his professed religious belief was the reason he was not hired.

- Even if Plaintiff could make out his *prima facie* case, the accommodations sought by plaintiff were not reasonable in that they would have resulted in undue hardship to Defendants.

## STATEMENT OF THE FACTS

Plaintiff became a member of the Seventh Day Adventist Church in 1995. (Pltf. Depo. II, p. 31).[1] The Sabbath of the Seventh Day Adventist Church takes place from sundown on Friday until sundown on Saturday. (Pltf. Depo. II, p. 30).

Plaintiff worked as a campus security officer at Winston-Salem State University ("WSSU") from August, 1999 until February, 2000. (Pltf. Depo. II, p. 22). During that time, Plaintiff worked on the Sabbath on a regular basis. (Pltf. Depo. II, p. 46). Plaintiff never mentioned any problem or issue with working on the Sabbath to any of his superiors at WSSU. (Pltf. Depo. II, p. 48). He worked rotating shifts and always worked his assigned shifts including the time when his shift fell on the Sabbath. (*Id.*).

In early, 2000, Plaintiff applied for a job as a deputy officer with the Edgecombe County Sheriff's Department ("Sheriff's Department"). (Pltf. Depo. II, p. 65). Nowhere on his application did Plaintiff state that his religious beliefs prohibited him from working Friday evenings or Saturday day shift (or at any other times). (Pltf. Depo. II, pp. 68-70). Plaintiff did not mention his religion or that he would be unable to work on the

---

[1] Plaintiff's deposition which was taken in a previous action, *Perkins v. James Knight, Sheriff of the Edgecombe County Sheriff's Department, in his Official Capacity, and the Edgecombe County Sheriff's Dep't*, 4:02-CV-109-H(4), on October 16, 2002 is hereinafter referred to as "Pltf. Depo. I." Plaintiff's deposition taken in this action on April 14, 2005 is hereinafter referred to as "Pltf. Depo II."

Sabbath in his interviews for this position. (Pltf. Depo. II, pp. 69-70). Plaintiff was subsequently hired for the position.

After working rotating shifts, including at least one Sabbath shift for three weeks, Plaintiff informed Sheriff James Knight that he was a Seventh Day Adventist and that he would not be able to work from Friday sunset until Saturday sunset. (Pltf. Depo. II pp. 68-70, 75). Plaintiff subsequently failed to show up for work for his scheduled shifts on April 8 and Friday, April 14. (Pltf. Depo. I, pp. 129-131,135-136). On April 11, 2000, Plaintiff sent a letter to the Sheriff's Department requesting special treatment so as to keep him from having to work the same rotating shifts that all of the other patrol deputies had to work. (Pltf. Depo. I, p. 151).

Based on Sheriff Knights' conclusion that there was no way to accommodate Plaintiff without a major hardship to the Sheriff's Department, Plaintiff was terminated. (Pltf. Depo. I, p. 163, Pltf. Depo. II, pp. 77-78). Plaintiff subsequently brought an action against the Edgecombe County Sheriff's Department for religious discrimination.[2] (Pltf. Depo. II, p. 78). Summary judgment was granted in that action in favor of the Edgecombe County Sheriff's Department. (Pltf. Depo. II, p. 79). The Court found that it would have been an undue hardship on the Sheriff's Department to accommodate Plaintiff's religious beliefs. (Order dated July 15, 2003 rendered by the Honorable Malcolm J. Howard attached).

Less than two months after his termination from the Edgecombe County Sheriff's Department, on May 8, 2000, Plaintiff applied for a police officer position with the Town of Princeville (the "Town"). (Pltf. Depo. II, p. 80). Plaintiff indicated on his application

---

[2] *Adam L. Perkins v. James Knight, Sheriff of the Edgecombe County Sheriff's Department in his official capacity, and the Edgecombe County Sheriff's Department*, 4:02-CV-109-H(4).

that he could work rotating shifts and he could work nights. (Ex. 1) (*Id.*, pp. 88-90, Ex. 7 to Pltf's Depo. II). Nowhere on his application did Plaintiff state that his religious beliefs prohibited him from working Friday evenings or Saturday during the day (or at any other times). (*Id.*, pp. 68-70).

In the latter part of July, Plaintiff was hired as a probationary employee for the Town, whose employment was temporary and funded by Federal Emergency Management Agency ("FEMA"). (Hopkins Aff. ¶ 6) (Foxx Depo., p. 45). Plaintiff was informed at the time he was hired that his position was a temporary FEMA-funded position. (Pltf. Depo. II, pp. 84, 85).

At that time, the Princeville Police Department had five officers, including the Chief of Police. Soon after Plaintiff was hired, another officer – Erica Ennis – was hired, also in a temporary FEMA-funded position. Thus, in the late summer of 2000, the Princeville Police Department consisted of <u>six</u> full time officers, including the Chief of Police. (Pltf. Depo. II, p. 86).

During his employment with the Town, Plaintiff was a problem employee. On January 5, 2001, Chief Cogdell issued a one week suspension to Plaintiff for a number of reasons. First, Plaintiff was suspended for arriving late to work on December 12, 2000. (Ex. 2) (Pltf. Depo. II, p. 105, Ex. 8) (Foxx Depo., p. 56). Plaintiff was also suspended for violating the Police Department's policy requiring that all traffic stops be called in to the Edgecombe County Sheriff Department's dispatch. (Ex. 2) (Pltf. Depo. II, p. 106, Ex. 8) (Foxx Depo., pp. 56-57). An additional reason for the suspension was that on December 25, 2000, Plaintiff left the Town while on duty without informing anyone that

he was leaving town, resulting in the Town having no police coverage. (Pltf. Depo. II, p. 108) (Foxx Depo pp. 57-58).

On May 2, 2001, Plaintiff was suspended a second time for failure to follow direct orders from his superiors, exceeding the authority of his superiors, inappropriate conduct and obligating the town by purchasing items without prior approval. (Ex. 3) (Hopkins Aff. 7, Pltf. Depo. II, pp. 113-114, Ex. 9) (Foxx Depo., p. 59). The suspension was recommended by Chief Cogdell and approved by Bobby Hopkins, the Interm Town Manager. (Hopkins Aff. 7). In general, Plaintiff had problems listening to his superior officers and following the chain of command. (Foxx Depo., p. 80).

On June 30, 2001, when the FEMA funding for the Town ran out and requests for additional funding were denied, the Town was forced to lay off two police officers, including Plaintiff. (Hopkins Aff. ¶8). Thus, effective July 1, 2001, there were four officers, including the Chief. (Pltf. Depo. II, pp. 120-121).

In July, 2001, Bobby Hopkins promoted Gary Foxx to the position of Chief of Police and demoted Rodney Cogdell to the position of Sergeant for disciplinary reasons. (Hopkins Aff. ¶10). In the early part of August, 2001, Rodney Cogdell resigned from the Police Department. (Hopkins Aff. ¶11). Upon Mr. Cogdell's resignation, there was one vacant police officer position. (Hopkins Aff. ¶11).

On August 31, 2003, Erica Ennis submitted an application for the open position. (Hopkins Aff. ¶12). Plaintiff maintains in this action that he did not fill out a new application for this position, but that in September, he was nevertheless interviewed for the position. (Pltf. Depo. II, pp. 124-125, 128). Plaintiff contends that during this

interview, he told Chief Foxx that he would not be able to work during the Sabbath. (Pltf. Depo. II, p. 130).[3]

On October 8, 2001, Officer Ennis was hired for the open position, bringing the total number of police officers for the Department to four. (Hopkins Aff. ¶15). (Pltf. Depo. II, pp. 120-121, 127). Bobby Hopkins, the interim Town Manager, was in charge of all personnel decisions including selecting and hiring applicants. (Hopkins Aff. ¶4). As a matter of practice, Mr. Hopkins generally reviewed applications, considered applicants, and brought candidates who he believed would be good employees before the Town Council prior to making a final decision on hiring. Thus the members of the Town Council would have indirect input into decisions with respect to personnel. (Hopkins Aff. ¶5). Mr. Hopkins however had final authority and made the ultimate decisions regarding hiring applicants. *Id.*

Mr. Hopkins based his decision to select Ms. Ennis for the open position instead of Plaintiff on Plaintiff's personnel records, work history, previous disciplinary record, and the relative qualifications of the candidates, as well as his personal knowledge regarding questionable conduct by Plaintiff while he was previously employed by the Town as a police officer. In particular, Mr. Hopkins felt it inappropriate to re-hire Mr. Perkins because of some racially derogatory remarks allegedly made by Plaintiff during a traffic stop. (Hopkins Aff. ¶16). In contrast, Ms. Ennis had no disciplinary record or previous suspensions issued during her previous employment with the Town. (Foxx

---

[3] For purposes of this Motion, Plaintiff's statements are taken as true; however it merits noting that Plaintiff's statements are inconsistent with documented evidence and all other witnesses' testimony. See, e.g., Foxx Depo., pp. 50-51 (Town requires all applicants to fill out a new application for each position, and Plaintiff's September 2001 application indicated he had no restrictions on the days and times he could work); Foxx Depo., pp. 18, 51-53, Ex. 11 to Chief Foxx's Deposition and attached as Exhibit 4 to this Memorandum (Chief Foxx's contemporaneous interview notes indicate that Plaintiff told Chief Foxx during this interview that he could work weekends and rotating shifts).

Depo., pp. 80-81). Moreover, due in part to Mr. Perkins' conduct during his prior employment with the Town, Ms. Ennis had more political support among the Town Council to whom Mr. Hopkins reported. (Hopkins Aff. ¶16). Mr. Hopkins was not aware of Plaintiff's professed need for a religious accommodation at the time this decision was made. (Hopkins Aff. ¶20, 21).

Plaintiff contends that he was interviewed by Chief Foxx again for a police officer position in November, 2001 and was again denied employment. (Compl. ¶¶32,33) Neither Bobby Hopkins nor Chief Foxx recalls a subsequent interview for a position in November, 2001. (Foxx Depo., pp. 22, 59-60).

On November 16, 2001, Plaintiff sent a letter to Bobby Hopkins requesting in writing a specific reason as to why he was not hired as a police officer. (Ex. 5) (Pltf. Depo. II, p. 154) (Hopkins Aff. ¶17). On November 19, 2001, Plaintiff sent a letter to Chief Foxx requesting a letter from the Department or the Town explaining why Plaintiff was not hired. (Ex. 6) (Hopkins Aff. ¶18). In this letter, Plaintiff made four suggestions as to how the Town could "accommodate" him and still be covered if he were hired for the position. (Complaint ¶ 29). On November 20, 2001, Bobby Hopkins sent Plaintiff a letter outlining some of the reasons that Plaintiff was denied employment with the Town. (Hopkins Aff. ¶19, Exhibit A to Affidavit).

It was the Town's goal to provide twenty-four hour police coverage to protect the safety of its citizens. (Pltf. Depo. II, p. 97) (Foxx Depo., p. 49). It was also the Town's goal to have two officers on duty at all times, especially on the weekends, as those were the shifts in which the most crime occurred during the week. (Hopkins Aff. ¶24) (Foxx Depo., p. 49). In addition, all officers were expected to be on call in case of an

emergency, also known among law enforcement agencies as "callup," "emergency callup," or "emergency callout." (Pltf. Depo. II, pp. 98, 159) (Thomas Report ¶ 9 attached as Ex. 7). Plaintiff acknowledged that police officers are expected to be on call twenty-four hours a day. (Pltf. Depo., p. 159).

In December, 2001, Plaintiff worked for North Carolina Natural Gas for a period of three weeks. (Pltf. Depo. II, p. 167). He did not notify his employer prior to being hired that he could not work on Friday evenings through Saturday evenings. He was ultimately terminated for refusing to work on the Sabbath. *Id.* In July, 2003, Plaintiff worked for Wackenhut for only a few hours. (Pltf. Depo. II, p. 169). Yet again, Plaintiff failed to disclose on his application or in his interview with Wackenhut that he was unable to work on the Sabbath. *Id.*

## ARGUMENT

Plaintiff alleges that the Town failed to hire him because of his religion – specifically because of his religious belief that he should not work from sundown on Friday to sundown on Saturday – in violation of Title VII. Title VII provides that it is unlawful for an employer "(1) to fail or refuse to hire … any individual … because of such individual's … religion [.] 42 U.S.C. §2000e-2(a)(1). The term "religion" is defined as including "all aspects of religious observance and practice, as well as belief, **unless an employer demonstrates that he is unable to reasonably accommodate . . . [a] prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business**." 42 U.S.C. 2000e(j) (emphasis added).

There is a two pronged test for analyzing religious discrimination claims under Title VII. **First**, the Plaintiff must establish a *prima facie* case by proving: (1) that he had

a *bona fide* religious belief, the practice of which conflicted with an employment duty; (2) that he informed his [prospective] employer of this belief; and (3) that the employer refused to hire him and/or subjected him to discriminatory treatment because of his inability to fulfill the job requirement/perform the employment duty. *See, Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 830 (9th Cir. 1999) (setting forth the *prima facie* elements of a claim for failure to hire on the basis of religious discrimination). *See also*, *Chalmers v. Tulon Company of Richmond*, 101 F.3d 1012, 1019 (4th Cir. 1996).

**Second**, if the employee is able to establish a *prima facie* case of discrimination, the burden then shifts to the employer to show either that it initiated good faith efforts to accommodate reasonably the employee's religious practices, or that it could not reasonably accommodate the plaintiff's religious needs without undue hardship. *Chalmers v. Tulon Company of Richmond*, 101 F.3d at 1019; *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d at 830; *Philbrook v. Ansonia Bd. Of Education*, 757 F.2d 476, 481 (2d Cir. 1984).

I. **PLAINTIFF CANNOT MAKE OUT A PRIMA FACIE CASE OF FAILURE TO HIRE BASED ON HIS RELIGION.**

A. **Plaintiff has failed to show that he has a Bona Fide Religious Belief Prohibiting him from Working on the Sabbath.**

An employee bears the burden of showing that he holds a sincere religious belief that conflicts with a job requirement. *Bushouse v. Local Union* 2209, 164 F.Supp.2d 1066, 1076 (N.D.Ind. 2001). "[I]t is entirely appropriate, indeed necessary, for a court to engage in analysis of the sincerity . . . of someone's religious beliefs in . . . the Title VII context." *Philbrook v. Ansonia Bd. Of Education*, 757 F.2d 476 (2d Cir. 1985). Such an

analysis is necessary "in order to differentiate between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud . . . [A]n adherent's belief would not be 'sincere' if he acts in a manner inconsistent with that belief . . . or if there is evidence that the adherent materially gains by fraudulently hiding secular interests behind a veil of religious doctrine." *Id.*

As in more fully set forth below, in the present case, Plaintiff has not set forth evidence to satisfy this sincerity element, i.e. that at the time in question – September 2001 to November 2001 – he possessed a sincerely held religious belief that he could not work on the Sabbath.

First, Plaintiff admits that he has worked on the Sabbath during previous employment. Plaintiff became a Seventh Day Adventist in 1995. (Pltf Depo. II p. 31). From August, 1999 until February, 2000, while employed as a campus security officer at WSSU Plaintiff worked on the Sabbath on a regular basis. (Pltf. Depo. II at 22, 46). Plaintiff worked a rotating shift and never mentioned any problem or issue with working on the Sabbath to any of his superiors at WSSU. (Pltf. Depo. II, p. 48). Plaintiff also worked at least one weekend shift with the Edgecombe County Sheriff's Department in 2000. (Pltf. Depo. II, pp. 68-70, 75).

Second, Plaintiff has repeatedly failed to inform potential employers and actual employers of a religious belief precluding him from working on the Sabbath and in fact has regularly represented that he **could** work rotating shifts without restriction, including shifts which fell on the Sabbath. Plaintiff did not mention an unwillingness to work on his Sabbath during any of his pre-employment interviews with the Edgecombe County Sheriff's Department. (Pltf. Depo. II, pp. 68-70). Plaintiff also indicated on his

application for the Sheriff's Department that he was willing to work rotating shifts and nights, including working on the Sabbath. *Id.*

Less than two months after his termination from the Sheriff's Department, Plaintiff again indicated on his application to the Princeville Police Department his willingness to work rotating shifts and nights without mentioning anything about not being able to work on the Sabbath. (Ex. 1) (Pltf. Depo. II, pp. 88-90, Ex. 7 to Plaintiff's Depo. II) After being laid off due to lack of FEMA funding, in September, 2001, Plaintiff re-applied for a police officer position which application is the subject of this action. Although Plaintiff contends in this action that he informed Chief Foxx during his interview that he would not be able to work during the Sabbath (Pltf. Depo. II, p. 130); Plaintiff readily admits that after September 2001 he failed to notify other potential employers of his alleged religious belief. Specifically, in December 2001, Plaintiff failed to inform North Carolina Natural Gas of his inability to work on the Sabbath. (Pltf. Depo. II, p. 167). In July of 2003, Plaintiff failed to disclose on his application or in his interview with Wackenhut that he was unable to work on the Sabbath. (Pltf. Depo. II, p. 169).

Plaintiff's actions – working on the Sabbath when it suited him, and routinely failing to notify prospective employers and others of the "restrictions" on his employment due to his alleged religious beliefs – belie Plaintiff's claim that he has a sincerely held bona fide religious belief which precludes him from working on the Sabbath.

Further, Plaintiff's own testimony indicates that his true motives may be other than a sincere religious belief. Plaintiff testified that during the time he was employed with the Edgecombe County Sheriff's Department, Plaintiff contacted a woman named

Amireh Al Haddad ("Al-Haddad") a public affairs representative of the Seventh Day Adventist Church who advised him to write down everything that happened as "potential evidence." (Pltf. Depo. I, p. 125). During this same time period, Plaintiff also contacted an attorney with the Church to get "legal lingo" and discuss legal strategy. (Pltf. Depo. II, p. 188). When asked if he had been advised not to inform his employers of his professed religious belief (presumably in order to facilitate litigation), he answered in the affirmative. (Pltf. Depo. II, p. 175). These factors, coupled with Plaintiff's prior litigation history, weigh strongly in favor of material motives for Plaintiff's claimed restrictions, rather than sincerely held religious beliefs.

Accordingly, for these reasons, Defendants are entitled to summary judgment. *See Hussein v. Waldorf Astoria*, 134 F.Supp.2d 591, 596-97 (S.D.N.Y. 2001) (granting summary judgment for employer on ground that no reasonable jury could find that plaintiff's religious asserted was *bona fide*).

### B. Plaintiff Has Failed to Provide Evidence that the Decision Maker Knew of any Sincerely-held Religious Belief.

Even if he were able to satisfy the first element, Plaintiff cannot make out the second element of his *prima facie* case, in that he has forecast no evidence that the Interim Town Manager, Mr. Bobby Hopkins, even knew of the alleged restriction on Plaintiff's work availability at the time Mr. Hopkins decided not to hire Plaintiff. Although Plaintiff alleges (contrary to his practice as outlined above, and contrary to all testimony of all other witnesses in this case), that he informed Chief Foxx during his interview in September 2001 that he was restricted in his ability to work rotating shifts because of a sincerely-held religious belief which would prohibit him from working on his Sabbath (Pltf. Depo. II p. 130), Plaintiff has offered no evidence to contradict the

testimony of the Interim Manager, Bobby Hopkins, that Mr. Hopkins was <u>unaware</u> of any such restrictions at the time he made the decision not to hire the Plaintiff.

It is undisputed that as Interim Town Manager, Mr. Hopkins was in charge of all personnel decisions including, but not limited to hiring applicants. (Hopkins Aff. ¶ 3.) Mr. Hopkins has testified that he was not aware of Plaintiff's request or his need for a religious accommodation prior to making his decision not to hire Plaintiff. (Hopkins Aff. ¶20). Plaintiff alleges that he was denied hire by the Town of Princeville on two different occasions – September, 2001 and November, 2001. However, Plaintiff's first mention of a request for accommodations which Mr. Hopkins was made aware of was contained in Plaintiff's November 19, 2001 letter to Chief Foxx.

As for further evidence that this is so, in his November 16, 2001 letter to Interim Manager Hopkins and his November 19, 2001 letter to Chief Foxx, Plaintiff requested written explanation as to why he was not hired. Exs. 5 and 6. (Pltf. Depo. II, p. 154). Mr. Hopkins' letter in response, dated November 20, 2001 (Ex. A to Hopkins Affidavit) sets forth the reasons the Plaintiff was not hired – none of which were remotely related to Plaintiff's current claim that he was unavailable to work on the Sabbath because of a sincerely –held religious belief. (Hopkins Aff. ¶19, Ex. A)

To satisfy this element, Plaintiff must proffer at least some evidence that he informed the decision maker that his religious needs conflicted with an employment requirement and asked the employer to accommodate his religious needs. *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir. 1996). *See also EEOC v. J.P. Stevens & Co.*, 740 F.Supp. 1135, 1137 (E.D.N.C. 1990) (holding that an employer may

terminate an employee who failed to provide advance notice of his religious beliefs regarding the Sabbath for excessive absenteeism).

In the present case, the applicable question is whether the decision maker – i.e. Interim Manager Hopkins – was aware of plaintiff's claimed inability to work weekends and request for accommodations prior to making the decision not to hire the Plaintiff. Plaintiff has failed to proffer any evidence – either direct or indirect - that Mr. Hopkins was aware of the Plaintiff's alleged religious belief that precluded him from working on the Sabbath until well after Mr. Hopkins made his decision. As such, Plaintiff has failed to establish the second element of his *prima facie* case of religious discrimination.

**C.     Plaintiff failed to proffer any evidence that the "real" reason he was not hired was due to his religious beliefs.**

As stated above, the only tangible contemporaneous evidence of the reasons Mr. Hopkins decided not to hire the Plaintiff are set forth in Mr. Hopkins' November 20, 2001 correspondence. (Ex. A, Hopkins Aff.). Plaintiff's after the fact contention that the "real" reason was due to a sincerely-held religious belief that precluded him from working on weekends is insufficient to sustain his burden of proof in this area. *Hill v. Lockheed Martin Logistics Mgm't, Inc.*, 354 F.3d 277, 286 (4th Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097 (2000)) ("[T]he ultimate question in every employment discrimination case is whether the plaintiff was the victim of intentional discrimination. To demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon a protected trait must produce evidence upon which one could find that the protected trait actually motivated the employer's decision. The protected trait must have

actually played a role in the employer's decision making process and had a determinative influence on the outcome.") (internal citations omitted).

## II. The Accommodations Sought By Plaintiff Were not Reasonable in That They Would Have Resulted in Undue Hardship to the Princeville Police Department

As stated above, Plaintiff has failed to present evidence sufficient to meet any of the elements of a *prima facie* case of discrimination. Even if Plaintiff had made out his *prima facie* case however, the accommodations now suggested by the Plaintiff are not reasonable and would have constituted an undue hardship on the Town.

### A. Title VII Does Not Require an Employer to Discriminate Against Some Employees in Order to Enable Others to Observe their Sabbath Nor Does it Require an Employer to Force Other Employees To Repeatedly Take Undesirable Shifts.

The Supreme Court in *TWA v. Hardison*, has set forth a threshold governing claims alleging failure to accommodate an employee's religious practices under Title VII which are specifically applicable to this action. The plaintiff in *Hardison*, an employee in a large maintenance and overhaul base was employed as a clerk in a facility which operated 24 hours a day, 7 days a week. The plaintiff asserted that his religious beliefs prohibited him from working on Saturdays. The Supreme Court held that the employer had not violated Title VII in terminating the plaintiff because the employee's religious beliefs could not have been accommodated by his employer without undue hardship. In *Hardison*, the Supreme Court found that **under Title VII an undue burden is present if the proposed accommodation would force changes in the schedules of other employees and alter the employer's otherwise neutral procedure**. *Hardison*, 432 U.S. at 81, 97 S.Ct. 2264. In so holding, the Supreme Court set forth the following guidelines:

Case 4:04-cv-00168-H   Document 32   Filed 09/30/05   Page 15 of 29

Any employer who . . . conducts an around-the-clock operation presented with the choice of allocating work schedules either in accordance with the preferences of its employees or by involuntary assignment. . .It was essential to TWA's business to require Saturday and Sunday work from at least a few employees even though most employees preferred those days off . . . TWA . . . had two alternatives: adopt a neutral system, such as seniority, a lottery or rotating shifts; or allocate days off in accordance with the religious needs of it employees. TWA would have to adopt the latter to assure [the plaintiff] and others like him of getting the days off necessary . . . but it could have done so *only* at the expense of others who had strong, but perhaps nonreligious, reasons for not working on weekends.

\* \* \*

**. . . It would be anomalous to conclude that by "reasonable accommodation" Congress meant that an employer must deny the shift and job preference of some employees . . . in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far**.

*Id.* at 79-81, 97 S.Ct. at 2274-75 (emphasis added).

The Supreme Court in *Hardison* also rejected the argument that the employer could have permitted the plaintiff to work a four-day week if necessary in order to avoid working on his Sabbath or that the employer could have replaced the plaintiff on his Saturday shift with other available employees through the payment of premium wages. The Court ruled that both alternatives would involve costs to the employer and that "to require TWA to bear additional costs when no such costs are incurred to give other employees the days off that they want would involve unequal treatment of employees n the basis of their religion . . ." *Id.* at 84-85, 97 S.Ct. at 2276-77.

As detailed below, each of Plaintiff's proposed accommodations in this case would have forced the Town to deny the shift preferences of other co-workers, half of whom had been with the Department well over a decade, a result not required under *Hardison. Id.; Weber v. Roadway Express, Inc.*, 199 F.3d 270 (5th Cir. 2000) (See

16

Affidavit of William Barnes attached hereto ("Barnes Affidavit"). Moreover, it would have disrupted the neutral rotating shift schedule. *Eversley v. MBank Dallas*, 843 F.2d 172, 175 (5th Cir. 1988) (finding that an employer is not required to rearrange its neutral scheduling practices to accommodate an employee). Finally, each of the proposed accommodations constitutes more than a *de minimus* expense because substituting other employees for Plaintiff's assigned shifts on the weekends would have forced Plaintiff's co-workers to receive less rest and less time off than he or she might otherwise have, and in some cases would have resulted in overtime for these officers. *Weber*, 199 F.3d at 274 (citing *Cook v. Chrysler Corp.*, 981 F.2d 336, 338 (8th Cir. 1992) (holding that hardship need not be quantifiable in economic terms)) (See Barnes Affidavit). **The mere possibility of an adverse impact on co-workers as a result of swapping shifts is sufficient to constitute an undue hardship**. *Weber*, 199 F.3d at 274.

### 1. The Proposed Accommodations

In November, 2001, Plaintiff proposed four accommodations, albeit long after the decision not to hire was made:

    (1)    assigning permanent shifts; that is, to do away with the neutral rotating shifts schedule and require certain officers to always work Friday night and Saturday day shifts.

    (2)    allowing reserve officers to cover the time Perkins would be unavailable.

    (3)    allowing Perkins the opportunity to swap shifts; that is to be allowed to have another police officer work those shifts that fell on his Sabbath and work an equivalent portion of the substituting police officer's shift.

    (4)    allowing Perkins to come in every weekend.

(Complaint ¶ 29).[4]

### a. Permanent Shifts

First, Plaintiff suggests that the Department change its neutral rotating shift schedule and assign permanent shifts requiring other officers to work each and every Friday night and Saturday day shift. Given the limited number of officers in the department besides Plaintiff in September, 2001 - Officers Barnes, Voliva and Chief Foxx, this would have been impossible without either forcing an officer to work back to back shifts or to have only one officer on duty on the weekends during the high crime time. It is undisputed that it was the goal of the Town to provide twenty-four hour coverage, seven days a week, to have two officers on duty at all times and that the weekends are the high crime time. (Pltf. Depo. II, p. 97) (Foxx Depo., p. 49) (Hopkins Aff. ¶ 24).

Plaintiff's suggestion to assign permanent shifts is utterly infeasible. Indeed, in his deposition, Plaintiff was not able to clarify how this proposal would have been feasible with the limited number of officers in the Department. (Pltf. Depo. II p. 140). When asked how permanent shifts would have worked within this Department, Plaintiff responded "that would be up to the Chief." (Pltf. Depo. II, p. 140). He went on to state that he "did not know how [the Chief] would have worked it out." (Pltf. Depo. II, p. 140).

---

[4] Because the fourth suggestion is identical to the third suggestion of swapping shifts, Defendants will address these suggestions collectively.

In September, 2001, there were two twelve hour shifts - from 7 p.m. to 7 a.m. and 7 a.m. to 7 p.m. Given the limited number of officers and the shift schedule, there are only two ways that such a suggestion could have worked, both of which constitute an undue hardship. Alternative one, if two officers were to be on duty at all times would mean that one officer would have had to work back-to-back 12 hour shifts. (Foxx Depo., pp. 60-61).

Chief Foxx was specifically asked:

Q:      Hypothetically, even if Mr. Perkins had informed you that he could
        not work weekends prior to that hiring decision, you were the chief
        at the time, would you have been able to run your police
        department assigning permanent shifts for your officers?

        A:      No, I couldn't.

        Q:      Why is that?

A:      Because I wouldn't have the personnel to run permanent shifts.
        We couldn't do it . . ."

        Q:      You would have had three officers at that time—

        A.      That is correct.

Q:      Besides Mr. Perkins. And so it would have resulted in officers
        having back-to-back shifts, is that correct?

        A:      That's correct.

        Q:      And is that feasible?

        A:      No, it's not.

(Foxx Depo., pp. 60-61). Plaintiff himself agreed that one officer working back-to-back shifts "would never happen . . . No one has ever done that. . . No officer would do that." (Pltf. Depo. II, pp. 147, 148). Plaintiff further conceded that he did not know if the other officers would have been amenable to working permanent shifts. (Pltf. Depo. II p. 150).

Alternative two would have been to have <u>only one officer</u>, as opposed to two, working the Friday night shift. Such a permanent schedule would have resulted in

endangering the safety of the officer who would have been responsible for the entire Town without back up from a fellow police officer during high crime time periods. It also would have jeopardized the safety of the citizens.

Moreover, permanent shifts would have resulted in additional hours for each individual officer and created a high likelihood that officers would have been entitled to overtime or premium wages on a consistent and regular basis. Payment of premium wages on a consistent basis has been held to constitute more than a *de minimus* cost to an employer and therefore rises to the level of an undue burden. *Hardison, Id.* at 84-85, 97 S.Ct. at 2276-77. Finally, as discussed *supra*, Title VII clearly does not require the Department to completely alter its neutral rotating shift schedule, to accommodate Plaintiff.

**b.      Using Reserve Officers to Cover Plaintiff's Shifts**

Second, Plaintiff proposed that the Department allow reserve officers to cover the Friday night and Saturday day shifts in which he was unable to work. This accommodation would likewise have jeopardized the safety of the citizens of Princeville. By Plaintiff's own admission, if the Town was left relying on reserve officers there would be nothing to ensure that each and every Friday night and Saturday day shift would be covered every week.

Plaintiff testified that reserve officers are volunteers who are not paid for their time. Working as a reserve officer is flexible in that officers can accept or decline shifts when asked to work. (Pltf. Depo. II, p. 121). The Police Department cannot require

reserve officers to come in to cover a particular shift. (Pltf. Depo. II, p. 122). Nor can the Police Department be assured that a reserve officer would be available every Friday night and a different reserve officer be available every Saturday day in order for the Department to provide twenty-four coverage on those weekend shifts. Plaintiff himself admitted that he could, and in fact would, decline to work on a weekend shift as a reserve officer if he had a conflict with that shift. (Pltf. Depo. II, p. 121).

When Plaintiff was asked how this second proposed accommodation, having reserve officers cover Plaintiff's shifts, would have worked within the Department, Plaintiff stated "I just made a statement to the chief. That's something that he would have to look at." (Pltf. Depo. II p. 151).

### c. Swapping Shifts with Another Officer/Always Having Plaintiff Work Weekends

Third, Plaintiff proposed that Defendants allow other officers to swap every Friday night and Saturday day shift requiring other officers to work his shifts and allowing him to always cover their weekend shifts on days that did not fall on the Sabbath. For the reasons set forth in Section A.1. above, this proposed accommodation was entirely infeasible given the limited size of the Police Department. Such an accommodation could only be accomplished by forcing an officer to work back to back shifts or to have only one officer on duty on the weekends during the high crime time. This accommodation would jeopardize the safety of the citizens of Princeville as well as the safety of the officer.

Plaintiff has asserted that on November 17, 2001, Plaintiff spoke to Officer Ennis who stated that she would have been willing to swap shifts with Plaintiff. (Complaint ¶ 30) (Pltf. Depo. II p. 157). However, Plaintiff fails to account for the fact that if Plaintiff

had been offered the position in September instead of Officer Ennis, Officer Ennis would not have been employed by the Town; therefore, such a swap would not have been feasible. Moreover, this is irrelevant to the Court's analysis of whether swapping shifts would have constituted an undue hardship. Such swapping would still have resulted in Officer Ennis working back to back shifts or the Department being staffed with only one full time officer on either a Friday evening shift or a Saturday day shift.

**B.    The Requirements of Title VII Do Not Mandate a Change In a Neutral Rotating Shift Schedule.**

Aside from the impracticalities of the specifically suggested accommodations in a department the size of Princeville, the law simply does not require such an accommodation. The seminal case involving whether a law enforcement employee has the right to demand special treatment regarding his work hours when the department maintains a neutral rotating shift schedule and is charged with the protection of its citizens is *Beadle v. City of Tampa*, 42 F.3d 633 (11th Cir. 1995), *cert denied* 515 U.S. 1152, 115 S.Ct. 2600 (1995). The plaintiff, a Seventh Day Adventist, was an officer-in-training with the Tampa Police Department. Like the Department in this case, the Tampa Police Department operated on a rotating schedule in order to assure around-the-clock service. When the Police Department declined to excuse plaintiff from work on his Sabbath and informed him that he could not transfer to another shift or position, he resigned and filed suit under Title VII. *Id.* at 634-36. Specifically, the plaintiff argued that the department could have assigned him to one specific field training officer who worked a Sunday through Wednesday shift and had Thursday, Friday and Saturdays off. The plaintiff claimed that had he been allowed to stay with that specific training officer throughout his training period, then he would have been able to observe his Sabbath

during the entire sixteen-week training program and upon completion of his training program, he could have been assigned to a position with a squad whose officers worked on Mondays through Fridays. *Id.* at 635.

The Eleventh Circuit held that the plaintiff failed to show a violation of Title VII and that, under *Hardison*, accommodating plaintiff would have created an undue hardship on the Police Department. The *Beadle* Court emphasized that the term "undue hardship" entails "not only monetary concerns but also the employer's burden in conducting its business." *Id.* at 636. In holding that the department had shown that an "undue hardship" would have resulted by virtue of the plaintiff's requested accommodations, the court stated the following:

> The Tampa Police Department is a twenty-four hour a day, seven day a week, three hundred sixty-five day a year agency that must allocate work scheduled among over nine hundred employees. More importantly, the Department is charged with protecting the health, safety, and welfare of its citizenry. The Department chose to implement a rotating shift schedule [and] randomly assign recruits to shifts . . .
>
> **We agree with the [district] court's refusal to interfere with the Department's scheduling and training programs. When the employer's business involves the protection of lives and property, courts should go slow in restructuring [its] employment practices (citation omitted). We conclude that the [district] court did not err when it found that requiring the Department to grant shift exceptions would result in a greater than *de minimis* cost and that the City had met its obligation under Title VII**.

*Id.* at 637-38 (emphasis added).

The facts of the present case are much more compelling than in *Beadle*. The Tampa Police Department had approximately nine-hundred employees and thus had flexibility regarding the reassignment of officers' work schedules and far more officers to possibly swap shifts. Conversely, the Princeville Police Department had only **three** full

time officer spots and the Chief of Police.[5]  The department in *Beadle* already had in place certain established shifts which required the officers who worked those shifts to work only on Mondays through Fridays (and thus did not coincide with Plaintiff's Sabbath).  Conversely, all officers in the Princeville Police Department worked rotating shifts which randomly allocated weekend work among the few officers.

### C.      Where There is Undue Hardship, Plaintiffs are not Required to Engage in a Futile Effort to Accommodate.

Plaintiff will undoubtedly argue, as he did in his previous case against the Edgecombe County Sheriff's Department,[6] that *EEOC v. Ithaca Industries, Inc.*, 849 F.2d 116 (4th Cir. 1988) requires an employer to attempt an accommodation of an employee's religious belief.  This argument is an incorrect and misleading interpretation of the holding in *Ithaca*.  While it is true that the *Ithaca* court used broad language in discussing the employer's failure to make an effort to accommodate the plaintiff, it is also apparent that the court based its holding, at least in part, on the fact that the employer had several options for accommodating the plaintiff that apparently presented no undue hardship to the employer.  *Id.* at 117.

Nothing in the *Ithaca* opinion indicates that the court even reached the issue of undue hardship.  Rather, the Court focused on whether, **in the absence of undue hardship**, the employer had a duty to attempt to accommodate the religious belief.  The *Ithaca* decision does not stand for the proposition that an employer must make a futile effort to accommodate an employee if a proposed accommodation would result in an

---

[5]  In September, 2001, the department employed Chief Foxx, Sergeant Barnes, and Officer Voliva.  In November, 2001, the Department employed Chief Foxx Sergeant Barnes and Officer Ennis.

[6] *Perkins v. James Knight, Sheriff of the Edgecombe County Sheriff's Department, in his Official Capacity and the Edgecombe County Sheriff's Dep't*, 4:02-CV-109-H(4).

undue hardship. This Court has previously rejected this argument, stating that "to adopt plaintiff's reading of *Ithaca* would convert Title VII into a collective bargaining law, (citation omitted) or inevitably require an employer to endure undue hardship before the defense could be raised. Nothing in Title VII or *Ithaca* indicates that such exercises in futility are statutorily required." (citations omitted). *See Order* dated July 15, 2003 attached as Exhibit 8. *See also Benton v. Carded Graphics, Inc.*, 28 F.3d 1208 (4th Cir. 1994) ("We doubt that Ithaca requires the implementation of an accommodating program that would obviously be an undue hardship."); *Weber*, 199 F.3d at 274.

Other Circuits, following *Hardison*, have concluded that Title VII "does not mandate a good faith effort to accommodate if the employer can show that any accommodation would impose an undue burden." *Weber*, 199 F.3d at 274. The *Weber* Court rejected a similar contention holding that no effort at accommodation is required if the employer can show that any accommodation would impose an undue burden on it. See also, *EEOC v. Townley Engineering & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988) (an employer is not required to engage in fruitless dialogue when it is clear that no accommodation could be made without undue hardship). *Virts v. Consolidated Freightways Corporation of Deleware*, 285 F.3d 508, 519 (6th Cir. 2002) (noting that an employer does not have to actually experience hardship in order for hardship to be recognized as too great to be reasonable); *Cary v. Carmichael*, 908 F.Supp. 1334, 1346-47 (E.D.Va. 1995) (granting employer's motion for summary judgment based on recognition that where plaintiff has taken position that cannot be reasonably accommodated, attempts at accommodation by employer are no longer required as they wold amount to an "undue burden").

As in these cases, Plaintiff's proposed accommodations in the present case were unreasonable in that they would have imposed a severe hardship on the Police Department. Accordingly, summary judgment in favor of Defendants is proper.

## III.    THE PRINCEVILLE POLICE DEPARTMENT IS NOT A PROPER PARTY TO THIS ACTION.

Defendants submit that summary judgment is proper as to this action in its entirety for all of the reasons set forth above. However, in addition, the Princeville Police Department is not a proper party and should therefore be dismissed outright.

"[I]n the absence of a statute, capacity to be sued exists only in persons in being." *McPherson v. First Citizen National Bank*, 240 N.C. 1, 18, 81 S.E.2d 386, 397 (1954). There is no statute that gives the Princeville Police Department the capacity to be sued. *See Coleman v. Cooper*, 89 N.C. App. 188, 192, 366 S.E.2d 2, 5 (noting that there is no statute authorizing suit against a police department.")   It is well established that a governmental unit such as a police department is not an entity capable of being sued. *See Coleman*, 89 N.C.App. at 192, 306 S.E.2d at 5 (police department was not an entity capable of being sued); *Jones v. City of Greensboro*, 51 N.C.App. 571, 593, 277 S.E.2d 562, 576 (1981), *overruled on other grounds, Fowler v. Valencourt*, 334 N.C. 345, 435 S.E.2d 530 (1993) (Greensboro Police Department lacks capacity o be sued).   For this reason, Plaintiff's claim against the Princeville Police Department fails as a matter of law and should be dismissed.

## CONCLUSION

Based On the foregoing, Defendants respectfully request that their Motion for Summary Judgment be granted and that this action be dismissed with prejudice.

Respectfully submitted, this the 30th day of September, 2005.

CRANFILL, SUMNER & HARTZOG, LLP

BY: _____

M. ROBIN DAVIS, ESQUIRE
N.C. State Bar No. 21655
ALYCIA S. LEVY, ESQUIRE
N.C. State Bar No. 30639
Post Office Box 27808
Raleigh, North Carolina  27611-7808
Tel:  (919) 828-5100

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day served the foregoing

*MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY*

*JUDGMENT* on all of the parties to this cause by depositing a copy hereof, postage

prepaid, in the United States Mail, addressed as follows:

> Adam L. Perkins, Plaintiff
> Post Office Box 687
> Timberlake, North Carolina 27583
> *Pro se plaintiff*

This the 30th day of September, 2005

_____
CRANFILL, SUMNER & HARTZOG, L.L.P.

**CERTIFICATE OF SERVICE**

This is to certify that the undersigned has this day served *DEFENDANTS' MOTION FOR SUMMARY JUDGMENT* on all of the parties to this cause by: Depositing a copy hereof, postage prepaid, in the United States Mail, addressed as follows:

> Adam L. Perkins
> Post Office Box 687
> Timberlake, North Carolina 27583
> *Pro se plaintiff*

This the 30th day of September, 2005

_____
CRANFILL, SUMNER & HARTZOG, L.L.P.